# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| T. MONTGOMERY FOLEY, )<br>      Plaintiff                    )<br>                                  )<br>v.                                )<br>                                  )<br>COMMISSIONER OF SOCIAL SECURITY, )<br>      Defendant               ) | Civil Action No. 06-72 Erie<br><br>District Judge McLaughlin<br>Magistrate Judge Baxter |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.     RECOMMENDATION**

It is recommended that the Plaintiff's Motion for Summary Judgment be denied. It is further recommended that the Motion for Summary Judgment filed by the Defendant be granted and the decision of the Commissioner denying Plaintiff's application for Supplemental Social Security Income be affirmed.

**II     REPORT**

    **A.     Procedural Background**

Plaintiff T. Montgomery Foley ("Foley") brings this action pursuant to Section 205(g) of the Social Security Act ("the Act"), as amended, 42 U.S.C. § 405(g), seeking judicial review of a final decision by the Commissioner of Social Security denying his Application for Supplemental Social Security Income (SSI) which he protectively filed on February 20, 2002. His application was denied, and he requested a hearing. A hearing was conducted on June 23, 2003, before Administrative Law Judge J. Robert Brown, at which Foley was represented by legal counsel. A vocational expert, Julie Andrews, testified at this hearing. ALJ Brown issued a decision on July 14, 2003, finding that Foley was not disabled during the relevant time period and denying his claim for disability benefits. Foley filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council on September 8, 2003. On November 3, 2003, the Appeals Council vacated ALJ Brown's unfavorable hearing decision and

remanded the case for re-hearing.

On remand, Foley's case was reassigned to Administrative Law Judge Bruce R. Mazzarella, who held a de novo hearing on May 5, 2005, at which Plaintiff was represented by legal counsel. Another vocational expert, Jay Steinbrenner, testified at this hearing. ALJ Mazzarella issued a decision on August 9, 2005, finding that Foley was not eligible for disability benefits. Foley filed a request for review of ALJ Mazzarella's decision with the Appeals Council on September 1, 2005; however, this request was denied by the Appeals Council on January 23, 2006.

Foley has filed this appeal seeking judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). He alleges errors entitling him to an award of benefits, or in the alternative, a new administrative hearing. The Commissioner disagrees. Both Foley and the Commissioner have filed motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The matter is therefore ripe for review and disposition.

### B.     Factual Background

Foley was born on September 18, 1952. (R. 26).[1] At the time of his most recent ALJ hearing, Foley was 52 years of age. He has a high school education and no relevant vocational experience, although he has engaged in work activity. (R. 17). Foley alleges that his ability to work has been limited by "chronic pain due to multiple back and neck diseases, cervical disk disease in neck, lumbar stenosis in lower back, herniated disks in neck and back, arthritis in both knees, and possible fibromyalgia." (Document # 3, Complaint, at ¶ 6).

### C.     Medical Background

The medical records indicate that Foley first sought treatment for headaches and neck

---

[1] The Court's recitation of relevant facts is derived from the transcript of the administrative record filed by the Commissioner as part of her answer in accordance with § 205(g)of the Act, 42 U.S.C. § 405(g), which is referred to hereinafter as "R."

pain in February 2001. (R. 83). On February 27, 2001, Walter Kuhen, M.D., reviewed MRI's of Foley's brain and cervical spine and found no abnormalities of the spinal cord or brain stem. However, Dr. Kuhen noted that Foley had degenerative disk changes at C4-5 and C5-6, and suspected minimal neural exit foraminal encroachment at C5-6 and C6-7. (R. 83).

On October 24, 2001, Foley was examined by Brian Dalton, M.D., who noted Foley's chief complaint as neck pain and associated headaches, which had worsened over the previous two to three years. (R. 84). Foley also presented with a secondary complaint of low back pain. (Id.). On examination, Dr. Dalton found that Foley had a normal gait, full range of motion of the lumbar and cervical spine, normal motor strength in all four extremities, no palpable paraspinal spasm or tenderness, symmetric reflexes, normal sensation, and no abnormal swelling of the extremities. (Id.). Dr. Dalton also noted that MRI results revealed degenerative disc disease at C5-6 and C6-7. (Id.). Based on these findings, Dr. Dalton diagnosed cervical spondylosis with associated degenerative disc disease, rule-out instability, and recommended that Foley begin a comprehensive exercise program. (Id.). Dr. Dalton also recommended that Foley undergo further work-up to investigate his symptomatology, including flexion/extension x-rays, SPECT scan of the cervical spine, and a facet block at C4-5, C5-6. (Id.).

On April 1, 2002, Foley sought emergency room treatment at Warren General Hospital for neck discomfort, headaches, testicular discomfort, and chest pain. (R. 303). Foley was found to be in no apparent distress, physical examination was normal, and urinalysis and cardiac profile tests were negative. Foley was discharged with a diagnosis of atypical chest pain and possible viral syndrome. (Id.).

On April 22, 2002, Abu Aziz, M.D., performed a medical evaluation of Foley, noting Foley's chief complaints as "cervical lumbar disc, arthritis of the knees, headaches." (R. 86-88). Dr. Aziz noted that Foley had been prescribed medication for his headaches by three different doctors, but either did not take the medication, or stopped taking it, and simply takes Advil "at times." (R. 86). Foley informed Dr. Aziz that if the headache pain became severe, he would lie down for awhile and the pain would subside. Foley also informed Dr. Aziz that his low back was "not bothering him much," but that he did have pain in both knees, with his right knee

3

being the most bothersome. (Id.). On examination, Dr. Aziz noted that Foley's range of motion was normal in all joints, there was no knee tenderness or swelling, his gait was normal, and his "tolerance for ambulation seem[ed] to be normal." (R. 87). In addition, Dr. Aziz found that Foley had intact mental function; no abnormalities of the head, neck, lungs, heart, or abdomen; intact cranial nerves; normal reflexes and motor strength; no sensory deficits; and no muscle atrophy. (R. 87-88).

On May 8, 2002, a state agency physician reviewed the medical evidence of record and determined that Foley could occasionally lift 20 pounds, and frequently lift 10 pounds; stand, walk and/or sit for a total of 6 hours in an 8-hour workday; perform unlimited pushing and/or pulling; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 91-96).

Foley was next seen by John Sutton, M.D., on February 10, 2003, to have disability forms filled out. (R. 271-72). At that time, Dr. Sutton noted that Foley was not in acute pain and was able to walk without support. Dr. Sutton noted further that Foley's cervical, lumbar and thoracic spine areas were non-tender, and he had full range of motion in all areas. (R. 272).

Dr. Sutton next saw Foley on March 24, 2003, for "intense back pain." (R. 268-69). After examination, Foley was assessed with degenerative disc disease of the cervical spine, generalized pain, and lower extremity numbness. Foley was continued on Vioxx and was given home exercises for his back and neck. (R. 269). Foley had a follow-up visit with Dr. Sutton on March 31, 2003, at which time he reported that his back pain was "manageable." (R. 267).

Foley did not seek any medical treatment again until April 27, 2004, when he went to the emergency room at Warren General Hospital complaining that his heart was racing. (R. 309). Upon examination, he was found to be in no apparent distress, with no abnormalities. CBC and EKG tests were normal, a chest x-ray was negative, and cardiac profiles were also normal. (Id.). Foley was released with a diagnosis of atypical chest pain.

On April 29, 2004, Dr. Sutton examined Foley and noted that while he complained of "an all body discomfort," his examination was "stable and relatively nonfocal." (R. 265). In particular, Dr. Sutton found that Foley had full motor strength, 2+ reflexes, no significant sensory deficits, and a normal gait. Dr. Sutton also indicated that Foley had missed two

different appointments to have an MRI of his lower spine done "because he was too uncomfortable to leave his house." (Id.).

On May 3, 2004, Lawrence G. Lareau, M.D. reviewed results of an MRI of Foley's lower spine, and noted that there was no spinal stenosis, but there was minimal central disc herniation at L4-5, a very small left-sided disc herniation at L2-3, and disc space narrowing at L4-5 and L1-2. (R. 294). Dr. Lareau also reviewed the results of an MRI of Foley's cervical spine on the same date and noted some degenerative disc changes at C5-6, with some neural foraminal narrowing at C5-6 bilaterally and C6-7 on the left. (R. 295).

In a letter to Foley's attorney dated June 9, 2004, Dr. Sutton explained that he had given Foley the "benefit of the doubt" in March 2004 and "temporarily disabled him to give [the doctor] time and funding to do the proper work up and try and diagnose his problems a little better." (R. 255). Dr. Sutton noted that numerous tests had since been conducted, including an anti-nuclear antibody, a rheumatoid factor, a lymes test, a CBC and ESR, and other tests "looking for unusual types of arthritis," the results of which were all either unremarkable or normal. (Id.). Dr. Sutton noted further that, while Foley's MRI did show minimal disc herniation, which could "cause some discomfort," it "shouldn't be giving him chronic debilitating pain." (R. 255-56). Dr. Sutton stated that Foley had "dropped off a 10 or 12 page dissertation on how his problems limit him through the course of the day, [but] they sound rather dramatic," noting that Foley "managed reasonably well in the office." (R. 256). Dr. Sutton concluded his letter by stating, "[a]t this point, I do not feel Mr. Foley is totally disabled." (Id.).

On July 30, 2004, Dr. Sutton drafted an office note stating that Foley was scheduled to have an epidural evaluation, but missed the appointment because he was in too much pain. (R. 253). As a result, Dr. Sutton indicated that the epidural evaluation would be rescheduled for August or September, but that Foley was reluctant to have it done. Dr. Sutton noted that Foley stated he might "not be able to make the appointment if he is in pain," and that he was "unable or unwilling" to schedule an early morning appointment, which Dr. Sutton indicated would "hold things up even further." (Id.). Dr. Sutton closed his note by stating that he would "remain

5

available to help [Foley] if he wants to help himself," and that Foley might be eligible for disability in the future if he "fails the epidurals and a Neurosurgical evaluation is consistent with our findings." (Id.).

On August 18, 2004, Foley was seen by LaTroy Navaroli, a certified nurse practitioner ("Navaroli") who worked with Dr. Sutton. (R. 251-52). Foley complained of experiencing "terrible pain, trouble sleeping, dizzy spells," and numbness in both legs. (Id.). Examination findings were essentially normal. Foley was encouraged to follow through at a pain clinic. (Id.).

On referral from Dr. Sutton, Foley was seen by Mohamed A. Kourtu, M.D., in September 2004, who noted some muscle spasm and tenderness around the facet joint region of Foley's neck. (R. 290). Nevertheless, Foley retained symmetrical reflexes in his upper extremities. (Id.). Dr. Kourtu scheduled Foley for translaminar cervical epidural injections, which were administered on September 15, September 29, and October 13, 2004. (R. 291-93, 313-316). Dr. Kourtu noted that Foley tolerated each procedure well and was discharged each time in stable condition with no sensory or motor deficits. (R. 292-93, 316).

On November 3, 2004, Foley saw Navaroli, and reported that he received minimal relief from the epidural injections, and was continuing to experience pain in his neck, head, and lower back. (R. 245-46).

On December 3, 2004, Plaintiff called Navaroli and complained that he was having "indescribable pain." (R. 244). Navaroli noted that Foley had refused to report for a stress test, failed to follow up at the pain clinic as requested, and refused to follow through with a recommended course of physical therapy. Navaroli noted further that Foley simply "refuse[d] to try to get out of bed and leave the house every day." (Id.). Navaroli indicated that, if Foley failed to show up for his re-scheduled stress test, he would discharge Foley due to his "lack of compliance with recommendations." (Id.).

On December 15, 2004, Navaroli noted that Foley refused to try physical therapy and that the rescheduled stress test had been cancelled. (R. 243). Because of Foley's continued refusal to follow his recommendations, Navaroli notified Foley on January 5, 2005, that he would no longer treat him. (R. 240).

6

On February 8, 2005, Foley was examined by Stephen Rynick, M.D., who noted that Foley was well developed and in no acute distress. (R. 298). Upon physical examination, Dr. Rynick found Foley to be oriented, alert and cooperative, with a normal gait, slightly reduced cervical range of motion, normal sensation, normal muscle strength, normal bulk and tone, and symmetrical reflexes. (R. 298-99). Dr. Rynick noted that, while x-rays revealed degenerative changes to Foley's cervical spine, there was no direct compression of the neural structure. (R. 299). Dr. Rynick diagnosed neck pain, consistent with cervical facet syndrome, and degenerative disc disease in the cervical spine, with mild foraminal narrowing in the lower cervical spine. (Id.). After discussing treatment options, Foley indicated that he would like to proceed with cervical facet joint blocks under fluoroscopy, which were administered on February 15, 2008. (R. 299, 297).

On February 28, 2005, Dr. Kourtu administered another epidural injection to Foley's cervical spine. (R. 286). Dr. Kourtu noted that he referred Foley to a psychiatrist "to help him with coping skill," and would be referring him to another doctor for possible surgical evaluation. (Id.).

On March 7, 2005, Dr. Rynick drafted a progress note indicating that Foley had experienced one to two hours of complete relief from his neck pain after the cervical facet joint injections, but that his symptoms had since recurred. (R. 296). Dr. Rynick noted that Foley had no radicular symptoms to the upper or lower extremities, and no difficulty with gait, bowel, or bladder. (Id.). On examination, Dr. Rynick found the cervical facets to be tender to palpation and compression, with no motor or sensory findings in the upper extremities. (Id.). Dr. Rynick assessed Foley with cervical facet syndrome, with inadequate duration of relief after cervical facet interarticular injections, and referred him for consideration of cervical facet rhizotomy, with radiofrequency ablation. (Id.).

On referral from Dr. Sutton, Foley was examined by James R. McLaughlin, D.O., a Board certified neurologist, on March 10, 2005. (R. 284-85). Dr. McLaughlin noted that Foley's complaints of severe and significant pain were inconsistent with his clinical presentation. (R. 284). While he acknowledged previous MRI findings suggesting mild cervical

degenerative disease, foraminal stenosis and possible face degeneration, as well as mild lumbar degenerative disease, Dr. McLaughlin indicated that the "only neurological abnormality of note [was] a mild small fiber sensory change in the feet which may or may not be real." (Id.). Dr. McLaughlin also assessed "headache disorder, appears to be mixed," due to "probable migraine based upon his childhood experience" and cervical myofascial syndrome. (Id.). Dr. McLaughlin recommended a dentistry referral to assess Foley's need for a bite plate, as well as a cervical pillow and physical therapy for his cervical spine. (R. 285).

An MRI of Foley's lumbar spine taken on May 27, 2005, revealed "[p]ossible minimal central disc herniation at L4-5;" a "[q]uestion of an annular tear involving the area centrally and just to the left of midline at L2-3;" and disc space narrowing at L4-5, L5-S1, and L1-2. (R. 327). An MRI of Foley's cervical spine taken on June 2, 2005, revealed "[s]light worsening of cervical disc degeneration at C5-6 and C6-7;" "[m]oderately severe spinal stenosis at C6-7 on the right;" and "mild to moderate foraminal stenosis at C4-5 on the left and C5-6 bilaterally." (R. 328).

On June 8, 2005, Dr. Sutton completed a medical source statement, in which he opined that Foley could: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk at least two hours in an eight hour workday; sit without limitation; perform limited pushing and/or pulling with his lower extremities; perform frequent crawling, occasional balancing, kneeling, crouching, and stooping, and no climbing; perform unlimited manipulative and visual/communicative functions; and withstand all environmental conditions. (R. 321-24).

### D.  Disability Hearing

At the disability hearing conducted on May 5, 2005, Foley testified that he is single and lives alone in a single story house he owns jointly with his mother. (R. 371-72). He testified that he drives only occasionally due to pain and medication, and he was driven to the hearing by his mother. (R. 373). During the previous fifteen years, Foley testified that he had performed part-time work as a self-employed handyman for elderly people for approximately four years, ending in 2004. (R. 374). Foley indicated that he had not reported any earnings or filed any tax

returns since 1983. (R. 374, 390). At the time of the hearing, Foley had been receiving welfare and food stamps for approximately 14 months. (R. 375). Foley has a high school education, with no additional vocational training. (R. 375-76). The last time he looked for work was two to three years prior to the hearing. (R. 376).

Foley testified that the biggest problems interfering with his ability to work were constant neck pain and headaches. (R. 377). Foley stated that any type of activity made his neck pain worse, and that his pain was a seven on a ten-point scale. (R. 379). Foley testified that his neck pain radiates into his shoulders and arms on a constant basis, causing him to wear a TENS unit, which didn't really help. (R. 384). Foley stated that he suffered constant headaches, which he rated a five on a ten-point pain scale. (R. 385). The only way he gets relief from his headaches is by laying down. (Id.).

Foley testified that his next biggest problem was low back pain, which got worse with activity. (R. 386). Foley indicated that the TENS unit was also used for his low back. In addition, Foley wears a back brace around the house for support, and uses a cane occasionally. (R. 387-88). Foley testified that his ability to work was also hampered by pain and numbness in his legs and arthritis in his knees. (R. 388).

With regard to daily activities, Foley testified that he prepared his own meals, did his own laundry, did grocery shopping with help from his mother, cleaned his own house, and took care of his personal needs, such as dressing and bathing himself. (R. 390-91). Foley testified that he spent most of his time each day lying in bed and reading. ((. 391-92). He stated that he could sit for ten or fifteen minutes before having to get up, at which time the ALJ noted that he had been sitting for 30 minutes at the hearing. (R. 392-93). Foley then stated that thirty minutes was his maximum time for sitting. (R. 393). He testified that he could stand for only ten to fifteen minutes at a time before having to sit or lie down. (R. 394). Foley stated that he could alternate sitting and standing for a maximum of thirty minutes before having to lie down. (Id.). He stated that he would then have to remain lying down for a couple hours before getting up and alternating sitting and standing again; however, he denied that he actually laid down for a couple of hours every thirty minutes throughout the course of a day. (Id.). Foley testified that he could

9

walk a couple of blocks and was prevented from going further by pain in his entire body. (R. 395). He stated that he could lift a maximum of ten pounds, or approximately the weight of a laundry basket. (Id.).

After Foley's testimony, the ALJ called upon a vocational expert, Jay Steinbrenner, to testify. (R. 404-12). The vocational expert testified that, at the time Foley filed his disability claim, he was considered a "younger person," with a high school education and past work experience as a handyman; but since the record was unclear about Foley's actual work experience, the ALJ asked the vocational expert to assume that he had "no past-relevant work." (R. 407). The ALJ asked the vocational expert to consider a younger individual approaching advanced age, with a high school education and no past work experience, having the ability to: sit for 30 minutes at a time; stand for 10-15 minutes at a time; alternate standing and sitting for 30 minutes at a time, but then having to lie down for a couple of hours; walk a couple of blocks at a very slow pace; and lift up to ten pounds. (Id.). The ALJ then asked if such an individual would be able to engage in any work in the national economy, to which the vocational expert responded "no," because the need to recline for two hours after alternating sitting and standing would cause the individual to be off task too often to sustain employment. (R. 408).

The vocational expert was then asked by the ALJ to assume the same individual could: sit, stand and/or walk for two hours each at a time, with normal breaks and meal periods, for up to eight hours in an eight-hour work day; lift twenty pounds occasionally and ten pounds frequently; and occasionally climb, balance, stoop, and crouch. (Id.). Based on these assumptions, the vocational expert testified that such an individual could unskilled, light exertion work as a cafeteria attendant, small products assembler, or cashier. (R. 409). In addition, the vocational expert testified that such an individual would not be precluded from performing a full range of unskilled sedentary level work. (R. 410).

### E.     The Administrative Law Judge's Decision

The ALJ made the following findings which are listed verbatim from his decision:

1.     The claimant has not engaged in substantial gainful activity since the alleged

onset of disability on January 1, 2001.

2. The claimant's cervical degenerative disc disease with small herniations and minimal encroachment; lumbar disc disease with minimal herniations; and history of knee surgery and possible arthritis of the knees are considered "severe," based on the requirements in the Regulations 20 CFR § 416.920(c).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The claimant's allegations of total disability were not credible or supported by the record as a whole for the reasons set forth in the body of the decision.

5. The claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; sit for 2 hours at one time and with normal breaks and meal periods for 8 hours in an 8 hour workday; stand and/or walk for 2 hours at one time and with normal breaks and meal periods for 8 hours in an 8 hour workday; and that he should not climb, balance, stoop or crouch on more than an occasional basis.

6. The claimant has no past relevant work (20 CFR § 416.965).

7. The claimant's age ranges from 49 to 52 years old, which is defined for Social Security purposes as a younger individual and a person closely approaching advanced age (20 CFR § 416.963).

8. The claimant has a high school education (20 CFR § 416.964).

9. The claimant has the residual functional capacity to perform a significant range of light work as set forth in Findings No. 5 (20 CFR § 416.967).

10. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Grid Rules 202.20 and 202.13 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as at the light level of exertion which consisted of the job of a cafeteria attendant, Dictionary of Occupational Titles (DOT) No. 311.677-010, amounting to 136,000 jobs in the national economy and 210 positions in the regional economy; small products assembler, DOT No. 706.684-022, amounting to 67,000 positions in the national economy and 500 jobs in the regional economy; and cashier II, DOT No. 211.462-010, totaling 1.75 million positions in the national economy and 1,560 jobs in the regional economy.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

The ALJ then determined that, based on the claimant's application and the record before him, Foley was not eligible for Supplemental Social Security payments.

## III. STANDARDS OF REVIEW

### A. Jurisdiction

District Court review of an ALJ's decision regarding disability benefits is limited in scope. 42 U.S.C. §§ 405(g) provides "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party ... may obtain review of such decision by a civil action." A decision of the Commissioner becomes final when the Appeals Council affirms an ALJ decision, denies review of an ALJ decision, or when a claimant fails to pursue the available administrative remedies. Aversa v. Secretary of Health & Human Services, 672 F.Supp. 775, 777 (D.N.J.1987); see also 20 C.F.R. §§ 404.905. This court has jurisdiction to review the case under §§ 405(g) because the Commissioner's decision became final upon the Appeals Council's denial of review of the ALJ's decision.

### B. Standards applicable to the ALJ's decision

The Social Security Act provides limited judicial review of a final decision of the Commissioner. In reviewing the Commissioner's decision, this Court may not decide facts anew, reweigh the evidence, or substitute this court's judgment for that of the Commissioner or, by extension, the ALJ. See Herron v. Shalala, 913 F.3d 329, 333 (7th Cir. 1994). Rather, this Court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. 42 U.S.C. § 405(g); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Pierce v. Underwood, 487 U.S. 552, 564-65 (1988) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)). See also Jesurum v. Sec'y of U.S. Dep't of Health and Human Servs., 48 F.3d, 114, 117 (3d Cir. 1995); Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981). Foley contends that the ALJ's decision is not supported by substantial evidence.

A disability is defined under the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A) (Supp. 2002); 20 C.F.R. § 404.1505(a) (2002). A claimant is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A).

The Commissioner must perform a five-step sequential evaluation process to make disability determinations under the regulations. See 20 C.F.R. § 416.920. If the claimant fails to meet the requirements at any step in the process, the Commissioner may conclude that the claimant is not disabled under the Act. The ALJ must determine, in order: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience and residual functional capacity. See 20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

In this case, the ALJ evaluated the case under these guidelines and determined, at step five, that Foley could perform certain light work available in the national economy. (R. 23). Specifically, the ALJ concluded that: (1) Foley was not currently employed in substantial gainful activity; (2) that he had impairments that were severe; (3) that these impairments did not meet the criteria for listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (1999), and that Foley retained the capacity to perform a significant range of light work; (4) that Foley had no history of past relevant work; and (5) that his impairments did not prevent him from performing such jobs as a cafeteria attendant, small parts assembler, and cashier II. (R. 23).

Foley has the burden of establishing that he is disabled under the Act. See 20 C.F.R. §§ 404.1512, 416.912. The ALJ should consider the claimant's ability to meet certain mental and physical demands of jobs when assessing his residual functional capacity. 20 C.F.R. §§ 404.1545(a), 416.945(a). Foley has specified four primary errors that he claims were made

by the ALJ in reaching his decision that Foley could perform a significant range of light work, which, in sum, challenge the ALJ's decision as being unsupported by substantial evidence of record. (See Plaintiff's Brief at pp. 17-27). In particular, Foley asserts that the ALJ erred in: (i) rejecting Foley's headaches as non-severe; (ii) failing to assist Foley in developing mental health evidence; (iii) failing to re-open the hearing to receive new and material evidence; and (iv) failing to properly evaluate the medical evidence in posing a "fundamentally flawed" hypothetical to the vocational expert. Each of these arguments will be considered, in turn, below.

## IV. DISCUSSION

### A. ALJ's Determination That Foley's Headaches Were Not Severe

Foley first argues that the ALJ erred as a matter of law in determining under step two of the sequential analysis that his headaches did not constitute a severe impairment under applicable Social Security Regulations. Specifically, the ALJ concluded that, "[t]he evidence as a whole" failed to show that Foley's headache condition was severe, as the results of a brain MRI were normal and Foley "obtain[ed] relief from his headaches through use of over-the-counter Advil." (R. 18). Foley argues that this determination was contrary to the record "lay and medical evidence documenting a constant severe cervical pain and headache problem...." (See Plaintiff's Brief at p. 17). This Court agrees.

The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two determination of severity in terms of what is "not severe." According to the Commissioner's regulations, "an impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Basic work activities are defined as "abilities and aptitudes necessary to do most jobs," including, inter alia, "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling" and "capacities for seeing, hearing, and speaking." 20 C.F.R. § 140.1521(b)(1) and (2).

The step two inquiry is intended to be a *de minimis* screening device to dispose of

groundless claims. Newell v. Comm'r of Social Security, 347 F.3d 541 (3d Cir. 2003). As such, the case and Rulings[2] interpreting the step two determination apply a more lenient standard than may be apparent from a strict interpretation of the language of the above regulation. In particular, Social Security Ruling ("SSR") 85-28 provides than an impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have "no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 SSR LEXIS 19, at *6-7. "If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and the sequential evaluation process should continue." Newell, 347 F.3d at 546, citing Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). "Reasonable doubts on severity are to be resolved in favor of the claimant." Newell, 347 F.3d at 547.[3]

In this case, the ALJ's application of the step-two severity determination was too restrictive, in that the ALJ considered the severity of Foley's headache condition separate and apart from Foley's "severe" cervical condition, with which the headaches were closely associated in the medical record. This was an error. The medical record makes clear that Foley's headaches, **in combination with** his degenerative cervical condition, had more than a minimal effect on his ability to work and, thus, constituted a severe impairment. Nonetheless, the ALJ's failure to characterize Foley's headaches as a severe impairment, when considered in combination with his cervical condition, was nothing more than harmless error, as the cervical condition itself was found to be severe, and the limitations associated with Foley's neck and head pain were adequately addressed by the ALJ in his assessment of Foley's residual functional

---

[2] A Social Security Ruling is the Social Security Administration's ("SSA") interpretation of the statute it administers and its own regulations. Although they do not have the force of law, once published, Rulings are binding on all components of the SSA. Walton v. Halter, 243 F.3d 703, 708 (3d Cir. 2001).

[3] SSR 85-28 instructs that "[g]reat care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued." SSA 85-28, 1985 SSR LEXIS 19, at *11-12.

15

capacity.

### B. ALJ's Alleged Failure to Develop Mental Health Evidence

Foley alleges that "it is abundantly clear that a consultative psychological and/or mental health evaluation was required in order for the ALJ to reach a sound determination in this matter." (Plaintiff's Brief at p. 19). This allegation is based upon indications in the medical record that Foley experienced depression as a result of his physical pain, for which he was prescribed Zoloft in August 2004. (R. 251-52). In addition, Foley notes Dr. Kourtu's psychiatric referral to help him with coping skills as further evidence of the need for a mental health evaluation. This Court is unimpressed.

In his decision, the ALJ found that there was "no evidence of the claimant having an ongoing depressive condition that is severe. In fact, the substantial evidence of record establishes that the claimant's depression did not satisfy the 12-month durational requirement of a severe impairment." (R. 18). Moreover, the ALJ noted that Foley "did not even complain of a depressive condition at the hearing." (R. 18). In fact, the record, as a whole, indicates that Foley has never claimed, or attempted to demonstrate, that his ability to work was adversely affected by any mental health impairment, including depression. Indeed, even in his Complaint filed with this Court, Foley has failed to list any mental impairment among the disabilities claimed. (See Complaint at ¶ 6). Furthermore, no medical professional of record has identified any functional limitations attributable to a mental impairment. As the Commissioner astutely stated in his Brief, "[t]here is no requirement that the ALJ must build a case for mental limitations where the objective medical evidence of record reveals no mental limitations and where Plaintiff and his counsel failed to even allege a mental impairment during the administrative proceedings." (Defendant's Brief at pp. 14-15). Accordingly, this Court finds that the ALJ's failure to obtain a consultative psychological and/or mental health evaluation was supported by the substantial evidence of record.

16

### C. ALJ's Alleged Failure to Re-Open Hearing to Receive New Evidence

Foley asserts that the ALJ should have re-opened the record to consider MRI findings that were obtained and submitted by his counsel after the May 5, 2005, hearing. In particular, Foley submitted the results of an MRI of his lumbar spine that was taken on May 27, 2005, and an MRI of his cervical spine that was taken on June 2, 2005. The lumbar MRI results indicated "minimal central disc herniation at L4-L5" and a possible annular tear slightly to the left of midline at L2-L3, but no other bulging or herniated discs were suggested, while the cervical MRI results were only "slightly worse" than those obtained a year earlier. (R. 327-28). Upon review of these results, the ALJ found that "the MRI evidence of the claimant's cervical and lumbar spine is not considered new and material evidence and does not warrant that the claimant be accorded any further limitations." (R. 22). This Court finds that this conclusion was reasonably based upon the substantial evidence of record, as the updated MRI findings were unaccompanied by any medical statement or opinion that such findings warranted additional functional limitations.

### D. ALJ's Evaluation of the Medical Evidence

Foley argues that the ALJ failed to give adequate weight to the opinions of his treating physicians, and failed to "provide rationale and reasoning for his apparent rejection of this evidence and opinion." (Plaintiff's Brief at p. 22). In his decision, the ALJ concluded that Foley had the residual functional capacity to perform work that did not require exertion above the light level. In particular, the ALJ found that Foley could lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk for two hours at a time; and occasionally climb, balance, stoop or crouch. (R. 21). In making these findings, the ALJ rejected the residual functional capacity assessment rendered by Dr. Sutton, because it was "inconsistent with his own office notes of June 9, 2004 and December 15, 2004." (R. 20).

The office notes from June 9, 2004, in particular, indicate that Dr. Sutton had initially given Foley "the benefit of the doubt" and "temporarily disabled him," but after obtaining MRI results revealing only minimal disc herniation in the lumbar spine and degenerative changes in

17

the cervical spine, opined that such findings "shouldn't be giving [Foley] chronic debilitating pain." (R. 255-56). Dr. Sutton also found that Foley "manage[d] reasonably well in the office" and was not totally disabled. (R. 256). On December 5, 2004, Dr. Sutton noted that Foley refused to try physical therapy and, as a result, Dr. Sutton discharged him from his care. (R. 243). Thus, the ALJ "reiterate[d] that minimal objective evidence, mild clinical examinations [sic] findings and even observations contained in Dr. Sutton's treatment notes warrant rejection of this source's assessment and to not give much weight at all to the limitations on his standing ability." (R. 20).

The regulations provide that an ALJ may reject a treating physician's opinion where it is: (i) not well supported by medically accepted clinical and laboratory diagnostic techniques, or (ii) inconsistent with other substantial evidence. 20 C.F.R. § 416.927(d)(2). Here, contrary to Foley's assertions, the ALJ did provide appropriate rationale and reasoning to support his rejection of Dr. Sutton's residual functional capacity assessment, in accordance with 20 C.F.R. Section 416.927(d)(2).

Furthermore, in determining Foley's residual functional capacity assessment, the ALJ noted that the assessment was "consistent with the thorough findings and assessment of an impartial consultative examiner, Abu Aziz, M.D., and a medical consultant's residual functional capacity assessment." (R. 21). In particular, the ALJ noted that Dr. Aziz disclosed that Foley had a "normal gait with apparent normal ambulation tolerances," "normal motor [strength], sensation and reflexes with no muscle atrophy," and no "swelling, tenderness or pain involving his joints," which findings were essentially consistent with Dr. Sutton's clinical and objective findings. (R. 21).

Based on the foregoing, therefore, this Court finds that the ALJ's conclusions regarding Foley's residual functional capacity assessment were adequately supported by substantial medical evidence of record.

## V. CONCLUSION

For the foregoing reasons, this Court concludes that the decision of the ALJ is properly supported by substantial evidence. Accordingly, it is recommended that the Plaintiff's Motion for Summary Judgment be denied and that the Defendant's Motion for Summary Judgment be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. Section 636(b)(1)(B) and (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of any appellate rights. See, e.g., Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
Chief U.S. Magistrate Judge

Dated: May 20, 2008

cc: The Honorable Sean J. McLaughlin
United States District Judge